LOKEN, Circuit Judge,
concurring in part and dissenting in part.
I concur in Parts II.A. and II.B.2. of Judge Bye’s opinion. I also agree that Dico is subject to an award of civil penalties for willful violation of an administrative order but would remand for redeter-mination of the amount of the penalties and therefore respectfully dissent in part from Part II.B.l.
A. Arranger Liability. I join Part II.A. of Judge Bye’s opinion but add the following to clarify my interpretation of the Supreme Court’s controlling decision in Burlington N. & Santa Fe Ry. v. United States, 556 U.S. 599, 608-13, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009), where the Court addressed the “fact-intensive” question of when 42 U.S.C. § 9607(a)(3) arranger liability attaches.
In Burlington Northern, after a six-week bench trial, the district court concluded that Shell Oil Company was liable as an arranger for selling hazardous chemicals to a “sloppy” distributor, knowing there would be leaks and spills in the delivery and storage process. Id. at 605, 129 S.Ct. 1870. The Ninth Circuit affirmed, concluding that an entity can “arrange for disposal” even if it did not intend to dispose of a hazardous substance. The Supreme Court reversed, concluding “that Shell was not liable as an arranger for the contamination that occurred at [the distributor’s] facility.” Id. at 613, 129 S.Ct. 1870. The Court explained that arranger liability is “less clear” in
cases in which the seller has some knowledge of the buyers’ planned disposal or whose motives for the “sale” of a hazardous substance are less than clear. In such cases ... determining] whether an entity is an arranger requires a fact-intensive inquiry that looks beyond the parties’ characterization as a “disposal” or a “sale” and seeks to discern whether the arrangement was one Congress intended to fall within the scope of CERCLA’s strict-liability provisions.
Id. at 609-10, 129 S.Ct. 1870 (citations omitted). The Court rejected the government’s contention that “Congress intended to impose liability on entities ... when they engage in legitimate sales of hazardous substances knowing that some disposal may occur as a collateral consequence of the sale itself.” Id. at 611-12, 129 S.Ct. 1870. Instead, the Court ruled,
In order to qualify as an arranger, Shell must have entered into the sale of D-D with the intention that at least a portion of the product be disposed of during the transfer process by one or more of the methods described in § 6903(3).... [T]he evidence does not support an inference that Shell intended such spills to occur.... Shell’s mere knowledge that spills and leaks continued to occur is insufficient. Id. at 612-13, 129 S.Ct. 1870 (emphasis added).
*356 This is not a case like Burlington Northern where there is no evidence that Dico intended to dispose of a hazardous substance. But as the Fourth Circuit explained:
Anytime an entity sells a product that contains a hazardous substance, it also intends to rid itself of that hazardous substance in some metaphysical sense.But intent to sell a product that happens to contain a hazardous substance is not equivalent to intent to dispose of a hazardous substance under CERCLA. For arranger liability to attach [under Burlington Northern ], there must be something more.
Consol. Coal Co. v. Ga. Power Co., 781 F.3d 129, 149 (4th Cir.2015). This is the fact-intensive inquiry Burlington Northern requires.
Despite acknowledging numerous fact disputes, the district court granted summary judgment for plaintiff United States because “no reasonable fact-finder could conclude that ... [Dico] did not intend to dispose of the remaining PCB when they sold the buildings to SIM,” and “no reasonable fact-finder could conclude that the buildings at issue were commercially useful.” United States v. Dico, Inc., 892 F.Supp.2d 1138, 1156-57 (S.D.Iowa 2012). I agree with Judge Bye the district court placed too much emphasis on the value of the buildings and what SIM intended to do with them, losing sight of the touchstone. issue — whether “the arrangement was one Congress intended to fall within the scope of CERCLA’s strict-liability provisions.” Burlington Northern, 556 U.S. at 610, 129 S.Ct. 1870.
I am somewhat concerned that Judge Bye’s opinion places too much emphasis on the analysis of arranger liability in pre-Burlington Northern cases. In my view, the earlier “battery cracking” cases should be disregarded, not distinguished. Even if those decisions were sound, the analysis was inconsistent with the Supreme Court’s in Burlington Northern. Likewise, the pre-Burlington Northern “useful product” doctrine, which the Ninth Circuit has continued to apply, was not adopted by the Supreme Court in Burlington Northern. Rather, the Court expressly put in the middle category of cases requiring fact-intensive inquiry those “in which the seller has some knowledge of the buyers’ planned disposal or whose motives for the sale of a hazardous substance are less than clear.”
Most of the cases in which our sister circuits developed what might be called multi-factor tests involved appeals from the grant of summary judgment imposing or denying arranger liability. See, e.g., Consol. Coal, 781 F.3d 129 (4th Cir.2015) (affirming summary judgment of no liability); NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682 (7th Cir.2014) (same); United States v. Gen. Elec. Co., 670 F.3d 377 (1st Cir.2012) (affirming summary judgment imposing arranger liability); Team Enters., LLC v. W. Inv. Real Estate Tr., 647 F.3d 901 (9th Cir.2011) (affirming no liability). Under Burlington Northern, comprehensive analysis is needed when a court is entering final judgment on arranger liability, and these opinions contain a great deal of useful analysis geared to the fact situations there at issue. But here, I conclude there are genuine disputes as to facts that are material to the issue of arranger liability under Burlington Northern. That is all we need decide. Therefore, I agree we should vacate the grant of summary judgment imposing arranger liability, the order assessing response costs for government expenses in remedying contamination at the SIM site in Ottumwa, and the award of punitive damages.
*357 B. Civil Penalties. A confusing aspect of this case is the fact that Dico’s alleged arranger liability turns on contamination found at one CERCLA site, the SIM property in Ottumwa, whereas the district court assessed civil penalties and punitive damages for Dico’s alleged violation of the EPA’s 1994 administrative order requiring remedial actions at a second CERCLA site that includes Dico’s property in Des Moines. CERCLA provides that any person “who, without sufficient cause, willfully violates, or fails or refuses to comply with” an administrative order issued in connection with a CERCLA abatement action “may ... be fined not more than [$32,500] for each day in which such violation occurs or such failure to comply continues.” § 9606(b)(1). I agree with the district court that the statutory standard that governs the EPA in assessing administrative penalties governs a district court exercising its discretion to determine the amount of a civil penalty:
In determining the amount of any penalty assessed ... the President shall take into account the nature, circumstances, extent and gravity of the violation or violations and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings (if any) resulting from the violation, and such other matters as justice may require.
42 U.S.C. § 9609(a)(3); cf. 33 U.S.C. § 1319(d) (mandating nearly identical standards when a court determines the amount of civil penalties to impose for violation of an EPA compliance order issued under the Clean Water Act).
The district court concluded as a matter of law that Dico violated two paragraphs of the 1994 administrative order for 162 days, the time it took to complete disassembly of the buildings on the Dico property — paragraph 31, which required Dico to implement a Maintenance Plan that included “long term ... encapsulation of all building insulation,” and paragraph 59, which required Dico to “immediately notify EPA’s designated Project Coordinator” if any “change in site conditions, during the action conducted pursuant to this Order causes or threatens to cause an additional release of hazardous substances from the Dico Property.” After a bench trial to determine the amount of civil penalties and punitive damages, the court assessed penalties of $10,000 per day for 162 days, a total of $1,622,000.00.
I agree with my colleagues that the record established at least a one-day violation of paragraph 59 for Dico’s willful failure to notify EPA before it demolished or disassembled the buildings in 2007. That was a change in site conditions that threatened the release of any PCBs that remained in insulation that was not destroyed during the primary site clean-up completed in 1997. See All Regions Chem. Labs, Inc. v. EPA, 932 F.2d 73, 74-75 (1st Cir.1991), where the EPA assessed, and the court upheld, a one-day administrative penalty of $20,000 for the failure to give immediate notice of a far more serious actual release of hazardous chemicals into the atmosphere. But the finding of multiple violations of paragraph 31 is more problematic. In September 2003, after Dico submitted a revised work plan advising that it may demolish the buildings in question, EPA replied:
The EPA does not necessarily object to demolition of the buildings, but urges Dico to coordinate any plans for demolition of the buildings with EPA. Certain disposal requirements may apply for building debris, and the EPA or state would want to oversee the demolition.
Demolition of the buildings would necessarily end permanent encapsulation of *358 their insulation. No doubt the failure to notify was at least a one-day violation of paragraph 31, as well as paragraph 59, but the finding of 162 days is unsupported.
The dominant purposes of CERCLA, and therefore the administrative order in question, are to prevent the release of hazardous substances and to take appropriate remedial action when releases have occurred. See 42 U.S.C. §§ 9604, 9606(a). Thus, Dico’s failure to give timely notice of a change in site conditions that threatened a release of the encapsulated insulation was clearly at least a one-day violation. But disassembling the buildings at the site for 162 days was not even arguably a 162-day violation if there was no actual release of hazardous substances during that activity. The district court granted summary judgment that a 162-day violation had occurred because reports from the 1990’s established that “demolishing the buildings necessarily resulted in a release of PCB.” Dico, 4 F.Supp.3d at 1066 n. 36. But there was no proof of an actual release. An EPA report following discovery of the demolition stated that “EPA is following up to determine whether PCB contaminated insulation may have been disposed of improperly.” Yet the government asserted no claim for response costs at the Dico site, and presented no evidence that hazardous substances were in fact released by debris, including insulation, that was deposited on the property during the disas-sembly process. Indeed, the district court expressly found that “[t]here has been no evidence of actual harm to people and/or animals as a result of the dismantling/demolition of the Dico Buildings.” Id. at 1055.
In determining the amount of civil penalties to assess, the district court stated that “discussing the evidence concerning PCB concentration is unnecessary in this case.” Id. at 1064 n. 40. In my view, this was an erroneous interpretation of § 9609(a)(3) and therefore an abuse of the court’s discretion in determining the amount of civil penalties. The court also observed that “Dico created another Superfund site (the SIM site in Ottumwa, Iowa), thus causing the EPA to spend Superfund money in investigating the PCB release at the SIM site.” Id. at 1064. I agree that if, in fact, Dico’s actions in disassembling the buildings without notice to EPA resulted in the transfer of PCB-contaminated steel beams that proximately caused the release of hazardous substances at the SIM site, that would be highly relevant in determining the amount of civil penalties to assess for Dico’s violation of the 1994 administrative order. But that question turns on disputed issues of material fact that have led us to reverse the grant of summary judgment holding Dico liable as an arranger for response costs at the separate SIM CERCLA site.
A massive civil penalty may not be assessed unless it is warranted by the “extent and gravity of the violation.” § 9609(a)(3). Accordingly, I would remand for a redetermination of the amount of civil penalties that should be assessed.