KELLY, Circuit Judge,
concurring in part and dissenting in part.
I agree with the court’s decision to affirm the summary judgment order with respect to the EPA order violation and civil penalties. I disagree that the district court erred in granting summary judgment on the question of arranger liability, and therefore with this court’s decision to reverse the district court’s award of punitive damages on that basis. Therefore, I respectfully dissent from Part II.A of the court’s opinion and the portions of Part II.B that discuss punitive damages.
' According to Burlington Northern, “[i]n order to qualify as an arranger, [Dico] *359 must have entered into the sale of [the buildings] with the intention that at least a portion of the [hazardous] product be disposed of during the transfer process.” Burlington N. & Santa Fe Ry. Co. v. United States, 556 U.S. 599, 612, 129 S.Ct. 1870, 173 L.Ed.2d 812 (2009). My reading of the undisputed facts leads me to conclude that Dico had the requisite intent to dispose of the PCB-laden insulation to support a finding of arranger liability.
As the court notes, other circuits have developed multi-factor tests that are useful in determining whether a given transaction qualifies as an arrangement for disposal. The Fourth Circuit has outlined the following four relevant, and helpful, factors:
the intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused, [2] the value of the materials sold, [3] the usefulness of the materials in the condition in which they were sold, and [4] the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).
Consol. Coal Co. v. Ga. Power Co., 781 F.3d 129, 148 (4th Cir.2015) (quotation omitted). In my view, each of these factors weighs in favor of finding Dico liable as an arranger.
The first factor is the “intent of the parties to the contract as to whether the materials were to be reused entirely or reclaimed and then reused.” Id. According to the testimony of Jim Hughes, president of SIM, SIM only ever intended to buy the beams. And according to Hughes’s testimony, Dico was aware of SIM’s intent. Hughes testified that prior to the sale he told Dico consultant and former employee Don Brown “that SIM wanted to buy only the steel beams from the buildings” and that they had discussed “the need to discard other building components.” Hughes testified that during the dismantling process “lots of little pieces of insulation fell on the ground and were blown around,” that the “insulation was being loaded into Waste Management Inc. dumpsters for disposal,” and that Brown was on-site during these activities.[8] He also said he specifically told Brown “that debris including the insulation was going to be hauled to a landfill.” The president of Titan testified that he himself visited the site “on a weekly basis” during the dismantling process.
Defendants’ own Statement of Additional Material Facts states that when he sold the building to SIM, Titan Tire president Bill Campbell “believed that Titan Tire, on behalf of Dico, was selling a commercially useful product — being the steel beams — for a reasonable value, inasmuch as it was his understanding that SIM intended to reassemble the steel beams on its property in Ottumwa for use in its business operations.” (Emphases added.) It was “the intent of the parties to the contract” that the beams would be “reclaimed and then reused,” not that the buildings would be reused in their “entirety.” In fact, there was testimony from defendants’ own witness that “it doesn’t make sense” to re-use insulation and that he had never seen it done in forty years of demolition experience. The contract itself instructed SIM to “demo” (demolish) the buildings. Cf. Pneumo Abex Corp. v. High Point, Thom-asville and Denton R.R. Co., 142 F.3d 769, 775 (4th Cir.1998) (“The intent of both parties to the transaction was that the wheel bearings would be reused in their *360 entirety in the creation of new wheel bearings.” (emphasis added)).
A second relevant factor is the “value of the material sold.” Consol. Coal, 781 F.3d at 148. The court acknowledges that a comparison of the price received by the seller to the avoided cost of proper disposal is a relevant indication of a seller’s intent in a transaction. See United States v. Gen. Elec. Co., 670 F.3d 377, 390 (1st Cir.2012). Dico sold Building 2 for $5,000 and the Maintenance Building for $12,000. SIM paid $143,200 for Buildings 4 and 5, as well as the Production Building, which was not subject to the 1994 UAO. While the district court did not make a finding on the exact amount of clean-up cost Dico avoided by selling the buildings, in 1996 the EPA estimated that it would cost $2.87 million to properly remediate the Dico buildings governed by the 1994 UAO— $4.39 million in today’s dollars. This court properly notes that Dico disputes this number, arguing that the buildings sold to SIM represent only four out of the six buildings included in the remediation estimate and SIM was not responsible for the removal of the foundations. While their objection is noted, there is nothing in the record to suggest that a building such as Building 2 could be properly remediated for less than $5,000, even leaving its foundation untouched. Indeed, after the demolition was discovered, Dico hired an environmental contractor to properly dispose of the insulation, employing a three-man crew over two separate days to haul the insulation in a HAZ MAT truck to an EPA-approved toxic landfill in Nevada (the total cost of this endeavor is not in the record). The EPA additionally spent $91,727.51 in the cleanup effort.
Most notably in this cost analysis, SIM was never informed that the buildings contained PCBs, and SIM’s president testified that this information would have affected his estimation of the value of the property. PCB-contaminated beams are worth less than PCB-free beams, and SIM assumed it was purchasing the latter, not the former. Dico presented no evidence even to suggest that it took any precautionary steps to ensure any possible contamination was contained prior to or during the dismantling process. Cf. Consol. Coal, 781 F.3d at 149-50 (ruling that defendant did not have requisite intent to dispose of PCBs when it only sold transformers that contained less than 50 ppm of PCBs and those that had higher contaminations were destroyed in accordance with the Toxic Substances Control Act of 1964); Burlington N., 556 U.S. at 613, 129 S.Ct. 1870 (explaining that defendant had taken precautionary measures in order to prevent leaks from occurring, including providing safety manuals to its purchasers, and “providing discounts for those that took safety precautions”).
The third factor of the Fourth Circuit’s test is “the usefulness of the materials in the condition in which they were sold.” Consol. Coal, 781 F.3d at 148. The beams were useless with the insulation still attached, i.e., in the condition in which they were sold. Dico’s own building demolition expert Daniel Hoffman admitted that it was necessary to strip away the insulation to “get at the beams.” He also testified that in his forty years of demolition experience he had never seen a commercial buyer reuse the insulation from these kind of buildings and that it “doesn’t make sense to reuse it.” The court speculates about whether other parties could have used other parts of the buildings, but no evidence to this fact was presented to the district court.[9] The only evidence presented was Campbell’s assertions that it was his intent to sell a useful product. In determining *361 arranger liability, however, courts must undergo a “fact-intensive inquiry that looks beyond the parties’ characterization of the transaction as a ‘disposal’ or a ‘sale’ ” to discern whether arranger liability is appropriate. Burlington N., 556 U.S. at 610, 129 S.Ct. 1870. “Frequently, the most probative evidence of intent will be objective evidence of what happened rather than evidence describing the subjective mind of the actor.” United States v. Cello-Foil Prods., Inc., 100 F.3d 1227, 1233 (6th Cir.1996) (quotation omitted).
The 'fourth factor is “the state of the product at the time of transferral (was the hazardous material contained or leaking/loose).” Consol. Coal, 781 F.3d at 148. A key fact that cannot be overlooked in this case is that the PCB-laden insulation was discarded at the Dico site in the presence of Dico employees. At the time of transferral the toxic product was not just “leaking” or “loose” — it was actively being discarded as a part of the transfer. On this issue, there is no dispute.
Taken together, these factors support the conclusion that Dico intended to dispose of the PCB-laden insulation contained within its buildings. Hughes testified that he was told Dico “wanted the buildings torn down to accommodate” a “large development project.” The fact that Dico was able to receive a sum of money for the beams contained within the buildings does not negate the fact that they wanted the buildings, and their PCB-contaminated insulation, gone.[10] See Consol. Coal, 781 F.3d at 147 (stating that Burlington Northern does not “foreclose arranger liability as a matter of law based on secondary intent ” (emphasis added)).
Knowledge alone is insufficient to find that a party had the intent to arrange for disposal. Burlington N., 556 U.S. at 612, 129 S.Ct. 1870. But the evidence in this case supports significantly more than Dico’s mere awareness that somewhere down the road some amoimt of toxic material could be released by the purchaser of their otherwise useful buildings. Dico cites to a Seventh Circuit decision finding that once a defendant sells a useful product to a third party, the toxins contained in the product are “out of the seller’s hands.” NCR Corp. v. George A. Whiting Paper Co., 768 F.3d 682, 706 (7th Cir.2014). The court ruled that this “lack of control is a good reason to find” that defendants did not arrange for disposal. Id. However, the court added: “we do not mean to suggest that an ostrich approach would work.” Id. And an ostrich approach should not work here, either, where Dico hid the very fact of the buildings’ contamination from their purchaser. Dico presented no evidence at the district court, beyond its own characterization of its intent, to create a genuine dispute of material fact regarding whether it qualified as an arranger. The facts, viewed in the light most favorable to Dico, still show that it intended “at least a portion of [the hazardous product] be disposed of during the transfer process.” Burlington N., 556 U.S. at 612, 129 S.Ct. 1870.

. Prior to the transaction presently at issue, SIM had bought a similar building from Dico — one not covered by the 1994 UAO — and this building had been dismantled and its insulation disposed of in the same fashion.

. The court distinguishes the "battery-cracking” cases and the copper wire case by saying *361 the sale product in those circumstances was "junk.” Yet the buildings in the present case had been left abandoned for years, one building was sold for a mere $5,000, most of its components were discarded on site, and its beams were hauled away to an open field and left there among old motors and twisted pipes. One of defendants’ own experts, Dr. Remy Hennet, called the SIM site "a junk yard.” If the. sale product in the battery-cracking cases was "junk,” the Dico buildings could be viewed in largely the same way.

. I agree with the court’s conclusion in Part II.B that Dico could not have reasonably believed no PCBs remained in the buildings.