10-2026-cv
State of New York v. Solvent Chemical Co. et al.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

## <u>SUMMARY ORDER</u>

RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Daniel Patrick Moynihan United States Courthouse, 500 Pearl Street, in the City of New York, on the 19th day of December, two thousand eleven.

PRESENT: DENNIS JACOBS,
                                    Chief Judge,
              PETER W. HALL,
              GERARD E. LYNCH,
                                    Circuit Judges.

- - - - - - - - - - - - - - - - - - - - -X

STATE OF NEW YORK,
          Plaintiff,

          -v.-                                     10-2026-cv(L)
                                                   10-2166-cv(XAP)
SOLVENT CHEMICAL COMPANY, INC.,                    10-2383-cv(XAP)
          Defendant-Third Party
          Plaintiff-Appellant-Cross
          Appellee,

ICC INDUSTRIES, INC.,
          Defendant-Third Party
          Plaintiff-Cross Appellee,

          -v.-

1

**OLIN CORPORATION,**
       <u>**Third Party Defendant-**</u>
<u>**Counterclaimant-Appellee-**</u>
<u>**Cross Appellant**</u>,

**E.I. DU PONT DE NEMOURS & COMPANY,**
       <u>**Third Party Defendant-**</u>
<u>**Appellee-Cross Appellant**</u>.

- - - - - - - - - - - - - - - - - - - -X

**FOR APPELLANT:**               Dennis P. Harkawik, Charles D. Grieco, Brenda J. Joyce, Jaeckle Fleischmann & Mugel, LLP, Buffalo, New York, <u>for</u> <u>Appellant</u> Solvent Chemical Company, Inc.

**FOR CROSS APPELLEE:**     Irwin F. Roth, Law Office of Irwin Roth, New York, New York, Robert J. Basil, Collier & Basil, P.C., New York, New York, <u>for</u> <u>Cross Appellee</u> ICC Industries, Inc.

**FOR APPELLEES:**             Daniel M. Darragh, Cohen & Grigsby, P.C., Pittsburgh, Pennsylvania, <u>for</u> <u>Appellee</u> E.I. du Pont de Nemours & Company.

                                  JoAnn T. Sandifer, Michael H. Wetmore, Joel B. Samson, Husch Blackwell LLP, St. Louis, Missouri, <u>for</u> <u>Appellee</u> Olin Corporation.

    Appeal from a judgment of the United States District Court for the Western District of New York (Curtin, <u>J.</u>).

    **UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that the judgment of the district court be **AFFIRMED IN PART, VACATED IN PART, REVERSED IN PART, AND REMANDED.**

Both sides appeal from a judgment entered by the United States District Court for the Western District of New York (Curtin, J.), resolving protracted litigation about who bears liability under the Comprehensive Environmental Response and Compensation Act ("CERCLA"), 42 U.S.C. §§ 9601-9675, for pollution at adjoining industrial sites. New York v. Solvent Chemical Co., 685 F. Supp. 2d 357 (W.D.N.Y. 2010). In a separate opinion issued today in Docket No. 10-2026-cv, we reverse the denial of Solvent's request for a declaratory judgment that the appellees are liable for future contribution costs.

We assume the parties' familiarity with the underlying facts, procedural history, and issues presented for review, and here set forth only the most salient aspects of the case.

For some decades, three companies owned adjoining facilities in the City of Niagara Falls, New York. E.I. du Pont de Nemours & Co. ("DuPont") owned and operated a chemical facility on water near the Niagara River. Solvent Chemical Company, Inc. ("Solvent") and Olin Corporation ("Olin") owned and operated adjoining sites inland of DuPont's. The Olin property (which is known as the Olin Hot Spot) is bounded by the Solvent property on one side and on the other side by Gill Creek, which continues across the DuPont site into the waterway. An 18-inch drainage pipe, running under the Olin property, carried drainage from the Solvent Site into Gill Creek. During World War II, DuPont operated a chemical facility on what became the Solvent Site.

In 1983, New York sued Solvent, its parent company, ICC Industries, Inc. ("ICC"), and others for environmental contamination at the Solvent Site ("*Solvent I*"). Three years later, Solvent filed a third-party complaint against DuPont, seeking contribution from DuPont for pollution generated from DuPont's operations on the Solvent Site during World War II. New York added DuPont as a defendant soon after. In 1996, the New York Department of Environmental Conservation ("DEC") issued a Record of Decision ("ROD") requiring Solvent to undertake remedial action at both the Solvent Site and the Olin Hot Spot as a result of chlorinated benzene contamination. Solvent

entered into a consent decree with New York obligating it to perform the remedies specified in the ROD in settlement of New York's CERCLA claims. Solvent began construction of the remedies in 1999 and continues to operate them today.

DuPont signed a consent decree with New York resolving its liability for pollution at the Solvent Site stemming from its own operations on the site during World War II. The consent decree specifically excluded pollution originating from the neighboring DuPont facility and migrating to the Solvent Site or Olin Hot Spot.

In 1998, Solvent filed a fifth amended third-party complaint adding Olin as a party and seeking contribution for its response costs incurred under its consent decree with New York. Olin counterclaimed against Solvent and filed a fourth-party claim against ICC seeking to recover a portion of response costs incurred while cleaning up Gill Creek in the early 1990s.

In 2001, Solvent commenced a new suit against DuPont asserting both cost recovery and contribution claims under CERCLA for the costs incurred under its consent decree with New York that resulted from migration of chlorinated aliphatics from the adjoining DuPont facility onto the Solvent Site and Olin Hot Spot ("*Solvent II*").

*Solvent I* and *Solvent II* were consolidated and tried without a jury over 19 days in late 2007. The district court entered judgment on May 14, 2010, awarding Solvent contribution from DuPont in the amount of $2,050,371 and from Olin in the amount of $462,288 for costs incurred prior a date in 2007 (chosen for administrative convenience). It denied Solvent's prayer for a declaratory judgment that DuPont and Olin were liable for future cleanup costs. The court also ordered Solvent to pay Olin $8,041 for the cleanup of Gill Creek.

**Solvent's CERCLA Contribution Claim.** The judgment requires DuPont and Olin to contribute to the costs incurred by Solvent in cleaning up the Solvent Site and the Olin Hot Spot. We affirm. The Solvent obligation arose under its consent decree with New York. Solvent is therefore entitled to seek contribution from potentially responsible parties

4

("PRPs") under CERCLA's contribution provision. See 42 U.S.C. § 9613(f)(3)(B) [CERCLA § 113(f)(3)(B)] ("A person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person . . . .").

DuPont argues that Solvent cannot obtain relief under subsection 113(f)(3)(B) because Solvent's complaint linked the contribution claim to subsection 113(f)(1). Even if the two subsections constitute separate causes of action for contribution, it is the factual allegations that render a federal complaint viable, not a recitation of statutes. See Albert v. Carovano, 851 F.2d 561, 571 n.3 (2d Cir. 1988). The filing of Solvent's original complaint (*Solvent II*) put DuPont on notice that Solvent was seeking contribution for costs it was incurring to clean up the Solvent Site and Olin Hot Spot pursuant to a consent decree with New York. This suffices to state a claim for contribution under CERCLA. Cf. Consol. Edison Co. of N.Y., Inc. v. UGI Utils., Inc., 423 F.3d 90, 104 (2d Cir. 2005) (finding that party adequately pled claim for cost recovery under section 107(a) when it had erroneously cited section 113(f)(1) in its complaint).[1] We also find that DuPont failed to preserve any statute of limitations defense that it had to Solvent's claim by failing to raise it until 2006.

The district court did not err in concluding that Solvent sustained its burden of proof: (1) DuPont was a PRP under section 107(a); (2) the DuPont plant is a facility under section 101(9); (3) DuPont released hazardous substances at the facility; (4) Solvent incurred some costs in responding to the release; and (5) the costs incurred conform to the National Contingency Plan. See Prisco v. A & D Carting Corp., 168 F.3d 593, 602-03 (2d Cir. 1999). DuPont argues that it cannot have common liability at the DuPont Site or Hot Spot because it released chemicals at a neighboring plant. Not so. See Niagara Mohawk Power Corp.

---

[1] We do not express an opinion on whether Solvent may proceed on its § 107(a) claim, as that claim is unnecessary to Solvent's recovery here.

*v. Chevron U.S.A., Inc.*, 596 F.3d 112, 134-35 (2d Cir. 2010).

**DuPont's Divisibility Defense.** DuPont argues that any liability it might have for harm to the Solvent Site is "divisible" from that of Solvent and Olin, and that it should pay only the incremental cost caused by the presence of chlorinated aliphatics at the Solvent Site and Olin Hot Spot. Divisibility (or apportionment) is inapplicable to contribution claims under section 113(f); it is a common law doctrine that may be used to blunt the harshness of joint-and-several liability under section 107(a). See Burlington N. & Santa Fe Ry. Co. v. United States, 129 S. Ct. 1870, 1882 & n.9 (2009). "[A]pportionment looks to whether defendants may avoid joint and several liability by establishing a fixed amount of damage for which they are liable, while contribution actions allow jointly and severally liable PRPs to recover from each other on the basis of equitable considerations." Id. (internal quotation marks and alterations omitted).

**Exclusion of Testimony**. An Olin employee, James Brown, testified about remediation of Gill Creek undertaken from 1990 to 1992, what was cleaned up, and how much it cost. The district court excluded his opinion testimony that Solvent should be responsible for the cost of cleaning up the full length of the creek (rather than just a small portion) because such a cleanup would have been required on account of Solvent's chlorinated benzene alone. The district court excluded this portion of Brown's testimony under Fed. R. Evid. 701(c), as testimony based on the witness's scientific, technical, or specialized knowledge rather than observation.

We review evidentiary rulings for abuse of discretion. General Elec. Co. v. Joiner, 522 U.S. 136, 139 (1997). We see no such error in the district court's conclusion that Brown relied on his technical knowledge to (1) link chlorinated benzene pollution throughout Gill Creek to Solvent and (2) assess whether the chlorinated benzene attributable to Solvent alone would have necessitated the removal of sediment throughout the creek. In analyzing the chemicals found in the stream and comparing them to state cleanup standards, Brown no doubt relied on the expertise he

6

had developed in 27 years of working on environmental and remediation projects.  A witness's application of specialized knowledge to facts gleaned in an investigation in order to render an opinion at trial is sufficient to run afoul of Rule 701(c).  See United States v. Garcia, 413 F.3d 201, 216-17 (2d Cir. 2005).

**ICC's Direct Liability Under** § **107(a)(2).**  The district court ruled that Solvent's parent company, ICC, is not liable for Solvent's pollution of Gill Creek.  Under CERCLA, a parent company can be held liable for a subsidiary's environmental harms if it directly "operates" the facility responsible for the harm.  See United States v. Bestfoods, 524 U.S. 51, 64-65 (1998).  In order for a parent to be directly liable under CERCLA, it "must manage, direct, or conduct operations specifically related to pollution, that is, operations having to do with the leakage or disposal of hazardous waste, or decisions about compliance with environmental regulations."  Id. at 66-67.  Of course, as the Supreme Court has recognized, "the difficulty comes in defining actions sufficient to constitute direct parental 'operation.'"  Id. at 66.

Olin cites as evidence of control a series of Solvent consultations with employees of another ICC subsidiary, Dover Chemical.  According to the president of Solvent (who was also president of Dover), Dover employees were asked to "look over the [Solvent] plant and give [Solvent] suggestions" based on their expertise.  Joint Appendix 229. It cannot be said that by this consultation, ICC exercised control over Solvent's operations that resulted in environmental harm and that was "eccentric under accepted norms of parental oversight of a subsidiary's facility," such that it is subject to operator liability under CERCLA. Bestfoods, 524 U.S. at 72.

**Allocation.**  Dupont and Solvent challenge different aspects of the district court's allocation of past response costs.  We review a district court's allocation of response costs for abuse of discretion.  Goodrich Corp. v. Town of Middlebury, 311 F.3d 154, 168-69 (2d Cir. 2002).  A district court abuses its discretion where (1) its decision rests on a legal error or clearly erroneous factual finding or (2)

7

its allocation cannot be located within the range of permissible outcomes.  Id. at 169.

As to the allocation of damages for the Solvent Site, the district court adopted the framework proposed by a Solvent expert, James Kohanek, which evaluated each party's share of the contamination addressed by each component of the ROD.  Using this framework, and relying on the findings of other experts, Kohanek found that 68.39% of the groundwater being remediated contained chlorinated aliphatics and 31.61% contained chlorinated benzenes.  He attributed 98% of the aliphatics to DuPont, using a "tracer" compound associated with its plant, and 2% to Solvent.  He attributed 98% of the benzene to Solvent and 2% to Olin.  He proposed allocating damages strictly along these volumetric lines.

While adopting Kohanek's framework, the court found that Kohanek erred in failing to "account for the principal negative environmental impact of the chlorinated benzenes driving the groundwater remedy," and "for significant concentrations of chlorinated benzene DNAPL[2] found in the soil covering approximately 60% of the Site as well as in the bedrock fractures[.]"  Solvent, 685 F. Supp. 2d at 451. The court turned to the allocation proposed by DuPont's expert, Charles Faust, which used volumes from monitoring wells--rather than pumping wells, as Kohanek did--and then adjusted the volumes by the relative risk of harm each contaminant posed to groundwater.  The court averaged Faust and Kohanek's calculations to conclude that chlorinated benzenes contributed 62.05% to the cost of cleanup and chlorinated aliphatics 37.95%.  It discounted DuPont's share of aliphatic contamination by 10% (giving that portion of liability to Solvent) to account for "the principley

---

[2] DNAPL, or dense nonaqueous phase liquid, is a heavier-than-water substance that flows through soil and into bedrock, where it comes to rest, cannot easily be cleaned, and acts as a long-term source of groundwater pollution.  The DEC selected a long-term containment strategy rather than a cleanup strategy because of the presence of DNAPL that could not be cleaned up and would continue to pollute the groundwater for years.

negative environmental impact" of chlorinated benzenes.  <u>Id.</u> at 451.  The court ultimately assigned Solvent 65.98% of the cost, DuPont 33.39% of the cost, and Olin .63% of the cost.

DuPont argues that Kohanek's proposed allocation of costs overlooked relative toxicities of chlorinated benzene and chlorinated aliphatics.  However, the court's allocation recognizes that Kohanek's proposed allocation *did not* account for toxicity.  It also recognized that Faust's allocation *did* account for toxicity, and it was therefore part of the overall allocation.  There was no abuse of discretion.

As to the allocation of damages for the Olin Hot Spot, the district court again relied on Kohanek's framework in allocating remediation costs.  Kohanek testified that chlorinated aliphatics constituted 93.52% of the contamination in the Hot Spot groundwater, and chlorianted benzenes constituted 6.48%.  He allocated 100% of the aliphatics to DuPont, which the parties do not contest on appeal.  He allocated 98% of the chlorinated benzene to Olin and 2% to Solvent.  He therefore proposed that DuPont bear 93.52% of the cost, Olin 6.35% (98% x 6.48%), and Solvent 0.13% (2% x 6.48%).   The district court found the proposed allocation inequitable, reasoning that:

> [T]he undisputed proof at trial established that the DEC's integrated B-Zone remedy for the Solvent Site included the installation and operations of pumping wells on Olin's property to achieve hydraulic control at the Hot Spot, based on the determination that the contaminants found in that area were similar to the predominant site indicator chemicals driving the remedy--<u>i.e.</u>, chlorinated benzenes--which were likely due in part to migration from the Solvent Site.

<u>Solvent</u>, 685 F. Supp. 2d at 452 (internal quotation marks omitted).  Citing the parties' inability to "reach any workable consensus as to the reasonable scientific conclusions to be drawn from the vast amounts of data generated at the Site," the district court concluded that DuPont should bear the same amount of liability for the Olin Hot Spot as it did the Solvent Site (<u>i.e.</u>, 33.39%), and that Olin should bear the responsibility proposed by Solvent

9

(6.35%).  <u>Id.</u> at 452-53.  The court allocated the remaining 60.26% to Solvent.  <u>Id.</u> at 453.

The district court failed to adequately articulate a basis for its allocation.  Solvent's proposal that Olin bear 6.35% of the cleanup costs for the Olin Hot Spot was premised on the view that 93.52% of the costs resulted from contamination by chlorinated aliphatics, of which DuPont was the sole producer.  The district court's rejection of this view in favor of a finding that the remedy was driven primarily by contamination from chlorinated benzenes--which both Olin and Solvent produced--therefore removes the foundation for the 6.35% figure.  Moreover, the district court should not, without further explanation, have borrowed for its Hot Spot findings the same percentage of responsibility it had allocated to DuPont for B-Zone contamination at the Solvent Site.  There was substantial dispute about the nature and extent of contamination at the Hot Spot, as well as about the similarity (or lack thereof) between the contamination at the Hot Spot and at the Solvent Site.  Absent resolution of at least some of these issues, the district court's use of its allocation at the Solvent Site in allocating costs for the Hot Spot is not supported.  Although the district court was disserved by the "parties' inability to reach any workable consensus as to the reasonable scientific conclusions" to be drawn from the evidence, <u>id.</u> at 452, the finding made nevertheless lacks support.

For the foregoing reasons, we **AFFIRM** in part, **VACATE** the district court's allocation of response costs for the Olin Hot Spot, **REVERSE** the district court's judgment in favor of Olin and DuPont on Solvent's prayer for a declaratory judgment for reasons stated in a separate opinion issued today, and **REMAND** for the district court to reallocate response for the Olin Hot Spot and to enter a declaratory judgment in favor of Solvent not inconsistent with this order.

                              FOR THE COURT:
                              CATHERINE O'HAGAN WOLFE, CLERK