**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| GP VINCENT II, a Delaware limited liability company, | No. 21-16555 |
| *Plaintiff-Appellant*, | D.C. No. 3:20-cv-00745-VC |
| v. | |
| THE ESTATE OF EDGAR BEARD, DECEASED, an individual; THE ESTATE OF NORMA BEARD, DECEASED, an individual; ETCH-TEK, INC., a dissolved California corporation, | OPINION |
| *Defendants-Appellees*. | |

Appeal from the United States District Court
for the Northern District of California
Vince Chhabria, District Judge, Presiding

Argued and Submitted October 20, 2022
San Francisco, California

Filed May 17, 2023

Before: Michael Daly Hawkins, Carlos T. Bea, and
Jacqueline H. Nguyen, Circuit Judges.

Opinion by Judge Hawkins;
Concurrence by Judge Bea

## SUMMARY[*]

### Environmental Law

The panel reversed the district court's dismissal, as barred by claim preclusion, of claims brought under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), and remanded for further proceedings.

GP Vincent II, the current owner of environmentally contaminated real property, brought CERCLA cost recovery claims against the Estates of Norma and Edgar Beard and Etch-Tek, Inc., the once-removed prior owners and tenant of the property, respectively. Mayhew Center, LLC, had purchased the property from the Beards. Walnut Creek Manor, LLC, owner and operator of a retirement community adjacent to the property, sued Mayhew. The district court concluded that Mayhew's property was the source of the tetrachloroethylene, or PCE, found on Walnut Creek Manor's site and held Mayhew liable under CERCLA and the California Hazardous Substance Account Act for any future response costs. While post-trial motions were pending in the Walnut Creek Manor action, Mayhew sued Norma Beard, asserting cost recovery and contribution claims under CERCLA and other claims seeking to hold her

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

liable for the judgment against it in the Walnut Creek Manor action and the contamination on both properties. The district court consolidated the two actions, and the parties settled.

Mayhew defaulted on its mortgage, and the property was placed in a state court receivership. GP Vincent took title to the property and began cleaning it up under an agreement it had entered into with the Regional Water Quality Control Board-San Francisco pursuant to the California Land Reuse and Revitalization Act ("CLRRA"). GP Vincent sued the Beard Estates, Etch-Tak, and others for CERCLA cost recovery, CLRRA contribution, and declaratory relief regarding future response costs. The district court concluded that the claims against the Beard Estates and Etch-Tek were barred by claim preclusion.

Reversing, the panel applied the federal law of claim preclusion, which bars litigation of claims that were raised or could have been raised in prior litigation if the prior action (1) reached a final judgment on the merits, (2) involved the same claim or cause of action as the later lawsuit, and (3) involved the same parties or their privies. The panel concluded that the Mayhew/Beard action ended in a final judgment on the merits. As to identity of claims, however, the panel concluded that claim preclusion did not apply because the CERCLA claims asserted in the prior litigation covered costs and obligations distinct from those underlying the claims GP Vincent brought because the Mayhew/Beard action resolved CERCLA liability to remediate the Walnut Creek Manor property, rather than the property owned by GP Vincent. Mayhew's CERCLA claim, which sought apportionment of the liability stemming from the Walnut Creek Manor action, was distinct from GP Vincent's CERCLA claim, which sought reimbursement for costs

incurred in connection with remediation of GP Vincent's property's own contamination.

Concurring in the judgment, Judge Bea wrote that he would reverse the district court's res judicata ruling on the different grounds that GP Vincent was not, and could not be, in privity with Mayhew, the prior owner. Judge Bea wrote that, in his view, an owner of a polluted plot of land cannot pass on its liability for remediation of pollution on that land under CERCLA to a future owner by mere transfer of title because CERCLA imposes that liability *in personam*, against the person or persons who owned the land, not *in rem*, against the property.

## COUNSEL

John R. Till (argued), Brian R. Paget, and Melanie A. Mariotti, Paladin Law Group LLP, Walnut Creek, California, for Plaintiff-Appellant.

Matthew G. Kleiner (argued) and Steven B. Bitter, Gordon and Rees Scully Mansukhani LLP, San Diego, California, for Defendants-Appellees the Estate of Edgar Beard and the Estate of Norma Beard.

Edward L. Seidel (argued), Womble Bond Dickinson (US) LLP, San Francisco, California; Scott M. McLeod and Keith Casto, Cooper White & Cooper LLP, San Francisco, California; for Defendant-Appellee Etch-Tek Inc.

**OPINION**

HAWKINS, Circuit Judge:

In this decade-old environmental litigation, we face this question: Does a final judgment resolving a contribution claim under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA") between two prior owners of environmentally contaminated real property bar a subsequent purchaser, who takes title with full knowledge of the condition of the land and that judgment, from pursuing a CERCLA cost recovery claim against a prior owner released under the earlier judgment? The district court answered that question in the affirmative and dismissed CERCLA claims brought by GP Vincent II, the current owner of environmentally contaminated real property located at 3313 Vincent Road in Pleasant Hill, California (the "Property"), against the Estates of Norma and Edgar Beard (the "Beard Estates") and Etch-Tek, Inc., the once-removed prior owners and tenant of the Property, respectively. We have jurisdiction under 28 U.S.C. § 1292(b). Because we conclude the CERCLA claims asserted in the prior litigation covered costs and obligations distinct from those underlying the claims GP Vincent now brings, we reverse and remand.

## I. BACKGROUND

Norma and Edgar Beard owned the Property in the 1970s and 1980s. From at least 1973 to 1981, Etch-Tek, a company run by Edgar, manufactured printed circuit boards at a facility located on the Property. It is believed that Etch-Tek's manufacturing activities resulted in the release of the hazardous substance tetrachloroethylene (also known as "PCE") into the Property's soil and groundwater.

By 1992, Etch-Tek had relocated its facilities, and Mayhew Center, LLC, a limited liability company managed by Dean Dunivan (collectively with Mayhew Center, LLC, "Mayhew"), purchased the Property. According to Mayhew, it used the Property primarily for office and storage space and did not conduct any activities involving PCE. At some point around 2004, Mayhew secured a promissory note with the Property. Shortly thereafter, litigation ensued.

### A. *Walnut Creek Manor, LLC v. Mayhew Center, LLC* (the "Walnut Creek Manor Action").

By 2007, Walnut Creek Manor, LLC, the owner and operator of a retirement community adjacent to the Property, learned that the soil beneath its retirement community near the Mayhew property line was contaminated with PCE, and its investigations indicated that the PCE contamination emanated from the Property. Walnut Creek Manor sued Mayhew and the then-defunct Etch-Tek in federal court. *Walnut Creek Manor, LLC v. Mayhew Ctr., LLC*, No. 4:07-cv-5664-CW (N.D. Cal.). Walnut Creek Manor sought to hold Mayhew liable for the contamination of its property and, to that end, asserted numerous claims, including CERCLA cost recovery, nuisance, trespass, and negligence, against Mayhew and Etch-Tek.

Walnut Creek Manor prevailed in the action. A jury awarded Walnut Creek Manor $350,000 in past damages and $1,597,000 in future damages. With regard to Walnut Creek Manor's claims under CERCLA and the California Hazardous Substance Account Act, the district court concluded that the Property was the source of the PCE found on Walnut Creek Manor's property and held that Mayhew "is 100 percent liable for any future response costs that are

necessary and consistent with the national contingency plan."

**B. *Mayhew Center, LLC v. Norma Beard* (the "Mayhew/Beard Action").**

While post-trial motions were pending in the Walnut Creek Manor Action, Mayhew sued Norma Beard seeking contribution for the judgment against it. *Mayhew Center, LLC v. Norma Beard*, Case No. 4:10-cv-00527-CW (N.D. Cal.). By that time, Edgar Beard was deceased and Etch-Tek had been dissolved, so Mayhew named only Norma Beard as a defendant.

In relevant part, Mayhew alleged that Etch-Tek discharged pollutants, including PCE, into the Property's soil during its manufacturing operations. Norma, along with her husband, were the property owners at the time of the contamination, and Edgar "actively participated in the design and operation of Etch-Tek" such that the Beards "had full and complete knowledge of Etch-Tek's handling and disposal practices." Mayhew further alleged that it had been held "liable for $1.974 million in past and future damages to Walnut Creek Manor and for 100% contribution to the cost of any cleanup to either property." Mayhew asserted cost recovery and contribution claims under CERCLA as well as several other common law and statutory claims by which it sought to hold Norma liable for the judgment against it in the Walnut Creek Manor Action and the contamination on both properties. Ultimately, Mayhew sought damages; an order requiring "Beard to remediate the Mayhew Center property and Walnut Creek Manor property"; and a judgment "declaring Beard liable for the costs of investigating, litigating and remedying the release of

hazardous substances at and in the vicinity of the Mayhew Center property and the Walnut Creek Manor property."

Before Norma filed an answer to the complaint, the district court consolidated the Mayhew/Beard Action with the Walnut Creek Manor Action and referred both cases to a magistrate judge for a settlement conference.

### C. Settlement of the Walnut Creek Manor Action and Mayhew/Beard Action.

Over the next few months, the parties in the Walnut Creek Manor Action and Mayhew/Beard Action (i.e., Walnut Creek Manor, Mayhew, Etch-Tek, and Norma Beard) participated in settlement conferences and in October 2010 reached a settlement (the "Settlement Agreement").

The Settlement Agreement was entered into by Walnut Creek Manor; Mayhew; Truck Insurance Exchange, insurer of Norma Beard; Norma Beard, "individually and as successor-in-interest to the Estate of Edgar Beard"; "and her sons, Kenneth, Richard, and Ronald Beard, RKR Investments, Inc., Etch-Tek, and Etch-Tek, Inc." Under the terms of the Settlement Agreement, Walnut Creek Manor was to be paid $400,000 in satisfaction of the jury's award of past damages and costs. Those funds were provided by Truck Insurance, on behalf of its insured Norma Beard. In place of the jury's award of future damages, the parties agreed to create an escrow account funded with $1,150,000—$300,000 contributed by Truck Insurance, on behalf of Norma Beard; $150,000 contributed by Norma Beard herself; and $700,000 contributed by Mayhew—from which Mayhew could draw on pursuant to an Escrow Agreement that was attached as an exhibit to the Settlement Agreement. The Settlement Agreement tasked Mayhew with all cleanup responsibilities and contained a series of

releases and indemnification obligations.  The Escrow Agreement only allowed disbursements to be made for remediation of the Walnut Creek Manor property and a certain portion of the Mayhew Center property that was "along the boundary with the [Walnut Creek Manor] property."

Following the settlement, the district court approved and entered a stipulated order dismissing the Mayhew/Beard Action with prejudice and a stipulated order and injunction in the Walnut Creek Manor Action.  The stipulated order and injunction in the Walnut Creek Manor Action outlined the parties' payment obligations and Mayhew's remediation obligations.  The court ordered Mayhew to "cleanup and abate all PCE in soil vapor, soil and groundwater at and beneath the WCM Remediation Area to concentration levels at or below the residential standards for PCE."  The WCM Remediation Area included portions of Walnut Creek Manor abutting Mayhew Center, including Walnut Creek Manor's "Maintenance Building, apartment building numbers 20, 21, 22, 23, 26, 27, 28, 29 and Laundry Rooms 6 and 7, and any soil vapor, soil and groundwater at or beneath" that area.

Mayhew failed to remediate all contamination at the WCM Remediation Area by the agreed-upon November 2012 deadline, and Walnut Creek Manor moved for sanctions and disbursement of the remaining escrow funds. The district court found Mayhew in contempt and ordered it to complete its cleanup and abatement obligations and release all remaining escrow funds to Walnut Creek Manor.

Eventually, Mayhew defaulted on its mortgage, and the Property was placed in a state court receivership.  That is when GP Vincent stepped in.

**D.  GP Vincent's Acquisition of the Property.**

GP Vincent was formed in 2016 for the purpose of purchasing, cleaning up, and developing the Property.  Prior to acquiring the Property, GP Vincent entered into an agreement with the Regional Water Quality Control Board–San Francisco under which GP Vincent assumed the obligation to clean up the Property pursuant to the California Land Reuse and Revitalization Act ("CLRRA").   The agreement indicates that GP Vincent would be "entitled to the immunities provided for in CLRRA" upon entry of the agreement and acquisition of title to the Property.

In February 2017, GP Vincent purchased the promissory note secured by the Property and foreclosed on and took title to the Property.  GP Vincent then began cleaning up the Property pursuant to its CLRRA Agreement.

## II.    PROCEDURAL HISTORY

GP Vincent initiated the underlying litigation in January 2020.  The operative complaint asserts three claims against the Beard Estates,[1] Etch-Teck, Mayhew, and others.   The claims include:  (1) CERCLA cost recovery, (2) CLRRA contribution, and (3) declaratory relief regarding future response costs.

The Beard Estates and Etch-Tek moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss the claims against them on the basis of claim preclusion.  The district court granted the motion.  The district court assumed that GP Vincent's claim arose under a different CERCLA provision than Mayhew's prior claim but nonetheless concluded the

---

[1] GP Vincent is suing the Estates of Norma and Edgar Beard pursuant to California Probate Code Section 550 only "to the extent of [their] estate's insurance assets."

claims were the same because both regarded the Property's PCE contamination. The court also found that (1) Edgar Beard and Etch-Tek were in privity with Norma Beard, such that they could benefit from the final judgment in the Mayhew/Beard Action; and (2) GP Vincent was in privity with Mayhew, such that it could be bound by the final judgment in the Mayhew/Beard Action. GP Vincent timely appealed.

## III. STANDARD OF REVIEW

We review de novo an order dismissing a complaint on claim preclusion grounds. *Media Rts. Techs., Inc. v. Microsoft Corp.*, 922 F.3d 1014, 1020 (9th Cir. 2019). "We take the factual allegations in the complaint as true and construe them in the light most favorable to the plaintiff." *Whittaker Corp. v. United States*, 825 F.3d 1002, 1006 (9th Cir. 2016). Because we are analyzing the preclusive effect of a federal court judgment, we apply the federal law of claim preclusion. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1077 n.10 (9th Cir. 2003).

## IV. DISCUSSION

"Res judicata, also known as claim preclusion, bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001) (citation omitted). The doctrine applies if the earlier litigation (1) reached a final judgment on the merits, (2) involved the same claim or cause of action as the later lawsuit, and (3) involved the same parties or their privies. *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

## A.  Final Judgment on the Merits.

The Mayhew/Beard Action ended in a judgment dismissing all claims with prejudice—a form of judgment generally deemed preclusive.  *Headwaters Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1052 (9th Cir. 2005) ("[A] stipulated dismissal of an action with prejudice in a federal district court generally constitutes a final judgment on the merits and precludes a party from reasserting the same claims in a subsequent action in the same court."); *Int'l Union of Operating Engineers-Emps. Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429 (9th Cir. 1993) ("The dismissal of the action with prejudice constitutes a final judgment on the merits.").

GP Vincent's argument that Mayhew breached the terms of its lending agreement by entering into a settlement and stipulating to the dismissal of its claims without the permission of its lender has no bearing on the finality of the judgment.  *Cf. Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) ("[A]n erroneous conclusion reached by the court in the first suit does not deprive the defendants in the second action of their right to rely upon the plea of res judicata." (internal quotation marks and citation omitted)).

## B.  Identity of Claims.

We next examine whether the claims asserted below are the same as the claims asserted in the Mayhew/Beard Action.  To do so, we consider four factors:  (1) whether the rights or interests established by the prior judgment would be destroyed or impaired by prosecution of the second action, (2) whether substantially the same evidence is presented in the two actions, (3) whether the two suits involve infringement of the same right, and (4) whether the two suits arise out of the same transactional nucleus of facts.  *Mpoyo*,

430 F.3d at 987. We have often deemed the fourth factor the most important. *See Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012).

The nature of CERCLA claims and remedies makes the inquiry before us a difficult one, so we begin with an overview of the statutory scheme. "Congress enacted CERCLA in 1980 to facilitate the remediation of hazardous waste sites and the resolution of liability for the related costs" by, among other things, allowing parties to seek reimbursement for costs associated with the remediation of hazardous waste. *Whittaker*, 825 F.3d at 1006.

To that end, CERCLA "provides two mechanisms for private parties to recoup their cleanup costs: cost-recovery actions under § 107(a), 42 U.S.C. § 9607(a), and contribution actions under § 113(f), *id.* § 9613(f)."[2] *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 951 (9th Cir. 2020). A § 107 claim allows a party that has incurred costs in connection with the investigation and remediation of environmental contamination to seek reimbursement of "a wide range of expenses" from other potentially liable parties. *Whittaker*, 825 F.3d at 1006. "In the lingo of CERCLA litigation, a polluter who might be liable under a § 107 cost recovery action is called a 'potentially responsible party' or 'PRP.'" *Id.* (quoting *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013)). A cost recovery action imposes strict liability, and "a successful § 107(a) claim generally results in [a PRP] being held jointly and severally liable for all cleanup costs sought in the suit, even those attributable, at least in part, to [other PRPs]."

---

[2] We employ the common convention of referring to the Public Law section numbers of CERCLA and citing to the United States Code.

*Arconic*, 969 F.3d at 951. Thus, CERCLA also provides for contribution actions under which PRPs that have been held liable for more than their fair share may "force [other PRPs] to shoulder their share of the burden." *Id.* "[A] claim for contribution, unlike one for cost recovery, turns on a party first facing or incurring liability to a third party." *Id.* In other words, "[a] party uses contribution to get reimbursed for being made to pay more than its fair share to someone else, and uses cost recovery to get reimbursed for its own voluntary cleanup costs." *Whittaker*, 825 F.3d at 1007.

With CERCLA's structure in mind, we turn to the facts of the Mayhew/Beard Action and GP Vincent's underlying claims. At a high level, both lawsuits arise out of the events involving release of PCE on the Property and responsibility for that contamination. Both cases necessarily involve an examination of the conduct of the Beards and Etch-Tek and their roles in causing the PCE contamination. The district court adopted this broad construction of the operative claims and concluded that the lawsuits involved (1) the same evidence—"whether and to what degree the Beards and Etch-Tek are responsible for the contamination based on their actions in the 1970s and 1980s"; (2) the same right— the right to ensure that the costs of cleanup are borne by those responsible for the contamination; (3) the same recovery—damages arising from the contamination-causing conduct; and (4) the same nucleus of facts—the discharge of pollutants into the Property's soil at a particular time and the costs associated with cleaning up that contamination.

However, when the factual bases of these claims are construed more specifically, it becomes apparent that the prior litigation resolved CERCLA liability to remediate the Walnut Creek Manor property rather than the Property at issue here. The Mayhew/Beard Action sought contribution

for liability imposed by the Walnut Creek Manor Action judgment, which pertained to the damage to and remediation of Walnut Creek Manor's property.   Although the Mayhew/Beard complaint purported to seek both § 113(f) contribution for the Walnut Creek Manor Action judgment and § 107 cost recovery for expenses related to PCE "under and emanating from [the] Mayhew Center property," the Settlement Agreement and stipulated injunction order focused on the Walnut Creek Manor property.  Specifically, the Escrow Agreement, which was incorporated by the Settlement Agreement and the injunction order, only allowed money from the settlement-created escrow account to be used for remediating the Walnut Creek Manor property and a portion of the Property adjacent to the Walnut Creek Manor property.   Further, the stipulated injunction order entered by the district court required Mayhew to remediate only the "WCM REMEDIATION AREA."[3]  That the court released all escrow funds to Walnut Creek Manor after holding Mayhew in contempt bolsters this conclusion.

The Mayhew/Beard Action thus involved a comparative analysis of Norma Beard and Mayhew's roles in causing PCE contamination on Walnut Creek Manor's property, not the Property at issue here.  That inquiry would most likely involve evidence regarding Norma Beard's role in the PCE contamination of the Property itself and any conduct on

---

[3] As noted earlier, the "WCM REMEDIATION AREA" included "the Maintenance Building, apartment building numbers 20, 21, 22, 23, 26, 27, 28, 29 and Laundry Rooms 6 and 7"—all within Walnut Creek Manor's property.

Mayhew's part that caused the contamination to spread.[4] Resolution of that contribution action solidified the parties' responsibilities for paying the damages awarded to Walnut Creek Manor and costs associated with remediating the contamination on Walnut Creek Manor's property.  GP Vincent's cost recovery claims, in comparison, regard the costs GP Vincent has incurred remediating the contamination on the Property itself and seek to assess strict liability for those costs—a determination that focuses exclusively on the Property's contamination and would not undermine a resolution regarding liability for the Walnut Creek Manor judgment.

Several considerations counsel in favor of adopting a narrower construction of the claims here.  First, as we have noted, Mayhew's contribution claim was triggered by the judgment in the Walnut Creek Manor Action.  Beyond denying Mayhew's cross claims and thereby establishing that Walnut Creek Manor was not responsible for any PCE contamination or liable to Mayhew for any future response costs, the judgment did not directly involve costs relating to contamination on Mayhew's own property.[5]  *Cf. Arconic*,

---

[4] For example, in the Walnut Creek Manor Action, the district court found that Mayhew engaged in slant boring near the lot line that created a pathway that allowed contaminants to migrate into Walnut Creek Manor's soil.

[5] The stipulated injunction order entered in the Walnut Creek Manor Action describes Mayhew's complaint in the Mayhew/Beard Action as "seeking, among other things, recovery of the damages awarded by the jury to [Walnut Creek Manor]."  The Settlement Agreement similarly describes the Mayhew/Beard Action as "seeking indemnity and contribution from Beard, as a prior owner of the Mayhew Center property, for the damages that [Mayhew] incurred in the [Walnut Creek Manor] Action."

969 F.3d at 954 (explaining settlement of plaintiff's claims against de minimis polluters did not trigger limitations period for contribution claim because it did not resolve a suit against plaintiff or impose costs on plaintiff).  And it is unclear whether Mayhew had voluntarily incurred any costs in connection with cleaning up the Property that would have supported a separate cost recovery claim.[6] *See United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 139 (2007).

Second, CERCLA expressly contemplates successive cost recovery actions because § 107 permits recovery only of those costs already incurred.  *See Stanton Rd. Assocs. v. Lohrey Enters.*, 984 F.2d 1015, 1021 (9th Cir. 1993). Indeed, CERCLA mandates that district courts enter declaratory judgments as to future liability and dictates that those liability determinations will be binding in subsequent actions involving later-incurred costs.  *See* 42 U.S.C. § 9613(g)(2)(B) ("In any such action [for the recovery of costs under § 107], the court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages."); *see also Media Rts. Techs.*, 922 F.3d at 1021 (explaining that claim preclusion does not bar claims that accrue after the filing of the operative complaint).

And we have recognized the viability of successive CERCLA claims regarding separate obligations.  *See Arconic*, 969 F.3d at 953–54 (explaining that settlement

---

[6] In fact, the district court found that "the prior Mayhew Center lawsuit must be understood as a section 113 action."  The statutory vehicle itself is not dispositive in this case, but it is relevant to our understanding of the factual basis of Mayhew's claim and the scope of obligations covered in the prior litigation.

regarding costs to remediate original plume did not give rise to contribution claim for costs relating to remediation of additional plume, formed when the contamination migrated into neighboring land downgradient of the original plume); *Whittaker*, 825 F.3d at 1013 (recognizing plaintiff could pursue § 107 cost recovery claim for costs incurred in cleaning up property that were separate from the costs for which it was liable under settlement resolving earlier litigation); *ASARCO, LLC v. Celanese Chem. Co.*, 792 F.3d 1203, 1215 (9th Cir. 2015) (noting "that there is no limit in the statute to prevent a party in an early settlement from seeking contribution related to a later settlement, so long as those settlements cover separate obligations).

Finally, when interpreting CERCLA, we must take care to construe the statute "to effectuate its two primary goals: (1) to ensure the prompt and effective cleanup of waste disposal sites, and (2) to assure that parties responsible for hazardous substances [bear] the cost of remedying the conditions they created." *United States v. Sterling Centrecorp Inc.*, 977 F.3d 750, 756 (9th Cir. 2020) (internal quotation marks and citation omitted). There is no doubt that the Mayhew/Beard Action resolved Norma Beard's CERCLA liability for the judgment in the Walnut Creek Manor Action and the cleanup of Walnut Creek Manor's property. However, we cannot say, on the current record, that the judgment in the Walnut Creek Manor Action resolved her CERCLA liability for the remediation of the Property's own contamination—the sole focus of GP Vincent's instant claims.

Consequently, we conclude, on this record, that Mayhew's CERCLA claim—which sought apportionment of the liability stemming from the Walnut Creek Manor Action—is distinct from GP Vincent's CERCLA claim—

which seeks reimbursement for costs incurred in connection with remediation of the Property's own contamination.[7] In so concluding, we do not hold that the distinctions between § 107 and § 113 CERCLA claims are dispositive, only that the record and facts of this case lead to the conclusion that the prior litigation concerned different liability than the present litigation.

## C. Privity.

Because we conclude that Mayhew's § 113 contribution claim regarding contamination of the Walnut Creek Manor property is distinct from the § 107 cost recovery claim GP Vincent asserts here, we need not decide whether GP Vincent is in privity with Mayhew or whether a final judgment regarding responsibility for the contamination and restoration of the Property would be binding on a subsequent property owner.

We do note that the district court erred, at a minimum, in determining on the pleadings that the judgment against Norma Beard, the sole defendant in the Mayhew/Beard Action, also barred any claims against Edgar Beard and Etch-Tek, non-parties to the Mayhew/Beard Action. "Generally speaking, the pursuit of a claim against one individual will not bar the pursuit of the same claim against another." *See F.T.C. v. Garvey*, 383 F.3d 891, 898 n.6 (9th Cir. 2004) (citing Restatement (Second) of Judgments § 49 (1982)). Although non-party preclusion may apply where the non-party is adequately represented by someone with the same interests who was a party to the prior litigation, *Taylor*

---

[7] The district court dismissed GP Vincent's CLRRA claim, concluding it was largely duplicative of the CERCLA claim and subject to the same res judicata analysis. Therefore, we also reverse and remand the dismissal of the CLRRA claim.

*v. Sturgell*, 553 U.S. 880, 894 (2008), that is a fact-intensive inquiry in this case best determined outside the confines of a Rule 12(b)(6) motion.

## V.    CONCLUSION

Because we conclude there is not a sufficient identity of claims, it was error to dismiss the complaint on claim preclusion grounds.  We reverse and remand to the district court for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

BEA, Circuit Judge, concurring in the judgment:

I concur in the majority's judgment, which reverses the district court's dismissal of GP Vincent II's ("GP Vincent") claims under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA") against Etch-Tek, Inc. ("Etch-Tek") and the Estates of Norma and Edgar Beard (collectively "Defendants") as barred by *res judicata*.  But I do so on the quite different grounds that GP Vincent, which owns the real property located at 3313 Vincent Road, Pleasant Hill, California (the "Mayhew Center Property"), is not—and cannot be—in privity with the prior owner, Mayhew Center, LLC ("Mayhew").  Thus, Defendants' claim of *res judicata* does not bar GP Vincent's action.

In my view, an owner of a polluted plot of land cannot pass on its liability for remediation of pollution on that land under CERCLA to a future owner by mere transfer of title. That is so because CERCLA imposes that liability *in personam*—against the person or persons who owned the land—not *in rem*—against the property.  And a future owner

is not precluded from maintaining a cost-recovery action to recoup its remediation costs even when the prior owners were previously embroiled in CERCLA litigation over the same polluted land (and even when they had entered into a settlement agreement amongst themselves, which settlement was reduced to a judgment).

Simply put, GP Vincent's current CERCLA pollution remediation cost-recovery action against Defendants, the previous owners and operator of the Mayhew Center Property, is not precluded by the terms of the stipulated dismissal of Mayhew's prior CERCLA litigation claims regarding the Mayhew Center Property, to which stipulated dismissal GP Vincent was not a party. The lack of privity between GP Vincent and Mayhew is fatal to Defendants' claimed *res judicata* defense as to GP Vincent's present action. For this reason, I concur in the majority's judgment that the district court's decision to dismiss this case must be reversed.

## I.      BACKGROUND

I agree in large part with the majority's recitation of the facts and history of this case. But there are some details the majority does not discuss that are essential to the resolution of this appeal. Thus, I will summarize the case's background with a particular focus on those details before I turn to the legal issues it raises.

The Mayhew Center Property was initially owned by Norma and Edgar Beard, whose interests are represented in this appeal by their respective estates. Etch-Tek, a now-defunct California corporation owned by Edgar Beard, leased the Mayhew Center Property as lessee during the 1980's to manufacture circuit boards. It is presumed that Etch-Tek's manufacturing is the likely source of the

tetrachloroethylene ("PCE") pollution currently on the Mayhew Center Property. In 1992, Mayhew purchased the Mayhew Center Property from the Beards. GP Vincent alleges that while Mayhew owned the Mayhew Center Property—purportedly in 2004[1]—Mayhew secured a loan through a mortgage note, which mortgage note encumbered the Mayhew Center Property. Mayhew owned the Mayhew Center Property until foreclosure proceedings began sometime between 2014 and 2017 on the mortgage note Mayhew had executed.

As the majority recounts, Walnut Creek Manor, LLC ("Walnut Creek Manor") was the owner of land adjacent to the Mayhew Center Property. Walnut Creek Manor sued Mayhew in 2007 in federal court under CERCLA to recover for the costs of remediation for the PCE pollution on Walnut Creek Manor's land it suspected had seeped from the Mayhew Center Property (the "Walnut Creek Manor Action"). After a jury trial, Walnut Creek Manor obtained a judgment against Mayhew for past and future damages arising from the contamination on Walnut Creek Manor's land. Mayhew was adjudged "100 percent liable for any future response costs" under CERCLA for the remediation of the Walnut Creek Manor property.

To fund its anticipated CERCLA-related liability, Mayhew then sued prior owner Norma Beard (the "Mayhew-

---

[1] The date of recordation is not in the record. I suggest the note was recorded in 2004 because that is what GP Vincent claims in its appellate briefing. I accept this as true for two reasons. First, my analysis does not depend on when the note was secured by the Mayhew Center Property or whether it was recorded. *See infra* Part II. Second, Defendants' briefing appears to accept that the note pre-dates the Walnut Creek Manor initiated CERCLA litigation involving the Mayhew Center Property.

Beard Suit"). Mayhew asserted three claims for relief that are relevant to this appeal: Mayhew brought a (1) CERCLA § 107 cost-recovery claim against Norma Beard to recover for remediation of pollution on *both* the Mayhew Center and Walnut Creek Manor properties; (2) a CERCLA § 113 contribution claim against Norma Beard for the anticipated costs of Mayhew's remediation of *both* the Mayhew Center and Walnut Creek Manor properties; and (3) a claim for declaratory relief to absolve Mayhew of responsibility for the PCE contamination on *both* properties. The district court consolidated the Mayhew-Beard Suit with the now-post judgment Walnut Creek Manor Action. The parties to both actions were then ordered to attend settlement conferences before a magistrate.

These conferences resulted in a global settlement agreement that was signed by the parties to the consolidated actions in October 2010. The signatories included Walnut Creek Manor, Mayhew, Norma Beard, Norma Beard's insurer, and representatives of Etch-Tek.**[2]** The global settlement apportioned costs among the parties to facilitate the clean-up of *both* the Mayhew Center Property and Walnut Creek Manor's land. The agreement's recitals stated that the settlement "compensate[d] [Walnut Creek Manor] for its past damages," "establish[ed] an escrow fund," and confirmed that Mayhew was "responsible for and w[ould] perform necessary cleanup of the PCE contamination existing at the [Mayhew Center] and [Walnut Creek Manor] properties." The parties gave this agreement teeth as among

---

[2] Only Norma Beard purported to represent another's interest: she signed "individually and as successor-in-interest to Estate of Edgar Beard." Mayhew, in contrast, signed only in its individual capacity as "Mayhew Center LLC, a limited liability company organized under California law."

themselves. But the agreement was silent as to the imposition of any covenants running with the Mayhew Center Property or the creation of any interests secured by the land to guarantee the obligations described in the settlement agreement. And the record does not contain any evidence that the settlement agreement was recorded with the local county recorder's office, so as to give notice to persons interested in the land.

Because of this settlement, the parties stipulated to a dismissal with prejudice in the Mayhew-Beard Suit, which the district court approved. And they stipulated to the entry of a proposed injunction order in the Walnut Creek Manor Action. The district court approved and entered the injunction order on November 23, 2010. The injunction order incorporated the parties' recitals, which announced that the settlement agreement "compensate[d] [Walnut Creek Manor] for its past damages and cost award, establish[ed] an escrow fund[,] . . . [and resolved that Mayhew was] responsible for and w[ould] perform necessary clean up of the PCE contamination existing at the [Mayhew Center] and [Walnut Creek Manor] properties."

The parties' filings evinced their unanimous agreement that the global settlement obligated Mayhew to remediate the PCE pollution on *both* the Mayhew Center and Walnut Creek Manor properties. Yet, Mayhew failed to do so. As a result, Mayhew was found in contempt for its violation of the Walnut Creek Manor Action injunction order. Mayhew was then ordered on February 12, 2014, to "release all remaining escrow funds to [Walnut Creek Manor] immediately." Mayhew subsequently defaulted on the 2004 mortgage note. As a result of the default, the Mayhew Center Property was placed in a "state court receivership" by judicial foreclosure proceedings initiated by Mayhew's

then-mortgagee. The timing of both the default and the receivership estate's creation are unclear from the record.[3]

Enter GP Vincent stage right. GP Vincent alleges that on February 1, 2017, it purchased the non-performing mortgage note from Mayhew's initial mortgagee. One day later, GP Vincent alleges it initiated nonjudicial foreclosure proceedings to gain title to the Mayhew Center Property. As the highest bidder at the consequent foreclosure sale, GP Vincent obtained title to the Mayhew Center Property. Cal. Civ. Code §§ 2924g–2924h. GP Vincent began to remediate the Mayhew Center Property and then sued Defendants (and several others not party to this appeal) for cost-recovery. Defendants moved to dismiss GP Vincent's claims as barred by *res judicata*. The district court found that GP Vincent was in privity with Mayhew and that there was an identity of claims between those settled in the Mayhew-Beard Suit and those GP Vincent alleged in its complaint. It therefore dismissed GP Vincent's claims with prejudice. GP Vincent timely appealed.

## II.    LACK OF PRIVITY

The question before us is whether Defendants can bar GP Vincent's current suit under the doctrine of *res judicata*. Defendants argue that GP Vincent, as the current owner of

---

[3] We are first informed of Mayhew's default and state court receivership over the Mayhew Center Property on January 31, 2017, when these details were recited in GP Vincent's agreement with the California Regional Water Quality Control Board that outlined GP Vincent's plan to remediate the Mayhew Center Property. The contempt order dated February 12, 2014, implied Mayhew still possessed the Mayhew Center Property as of that date. Thus, Mayhew's default and the imposition of a receivership estate on the Mayhew Center Property occurred at some time between February 12, 2014, and January 31, 2017.

the Mayhew Center Property, is Mayhew's 'successor-in-interest.' They believe this necessarily implies GP Vincent is bound, as was Mayhew, to the stipulated dismissal of the Mayhew-Beard Suit. For a suit to be barred by *res judicata*, there must be (1) an identity of claims between the current suit and the prior litigation, (2) a final judgment on the merits in the prior suit, and (3) the same parties or their privies in both cases. *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

## A.  Applicable Legal Standard

*Res judicata* prevents "successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit." *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001). Defendants rely on the rule that "preceding and succeeding owners of property" may be bound to the same judgment. *Taylor v. Sturgell*, 553 U.S. 880, 894 (2008). Because first Mayhew and then GP Vincent owned the Mayhew Center Property, Defendants contend GP Vincent is the 'succeeding' Mayhew Center Property owner and cannot 're-litigate' the CERCLA claims Mayhew brought against Norma Beard in the Mayhew-Beard Suit.

But mere successive-in-time property ownership is not so talismanic. That two parties who owned the same property at different times bring lawsuits with similar claims does not automatically mean the succeeding owner's claims are barred by *res judicata* because the first owner's claims resulted in a judgment against him. The rule that succeeding property owners can be bound by the doctrine of *res judicata* "originate[s] . . . from the needs of *property law*" and protects the finality of a judgment in litigation over *those rights associated with the property itself*. *Id.* at 894

(emphasis added) (citation omitted).  This application of *res judicata* does not apply if the litigation does not adjudicate a party's interests in the property itself.[4]  *Postal Telegraph Cable Co. v. City of Newport*, 247 U.S. 464, 474–75 (1918) ("The ground upon which, and upon which alone, a judgment against a prior owner is held conclusive against his successor in interest, is that *the estoppel runs with the property*, that the grantor can transfer no better right or title than he himself has, and that the grantee takes *cum onere*."[5] (emphasis added)); *Minn. Mining Co. v. Nat'l Mining Co.*, 70 U.S. (3 Wall.) 332, 334 (1865) ("Where questions arise which affect titles to land it is of great importance to the public that when they are once decided they should no longer

[4] To illustrate the difference, take the following comparison.  Assume a property owner loses a quiet title action, which affirms his neighbor's easement to walk across the owner's land.  The owner cannot defeat the judicially established easement through a conveyance of the property that does not mention the easement to a third party.  That is exactly the context where courts apply the rule that successive owners of property are in privity.  The successor owner takes the land subject to the easement.  But this would not be true for the purchaser of a chair that the prior owner had used to batter his neighbor.  Even were the chair's purchaser aware of the chair's role in the battery, he would not be on the hook just because the chair was involved in—indeed essential to—the tort action between the original owner and his neighbor.  The interests of property law as to who owns the chair, or whether the chair is liened, are not involved in the battery claim.  A battery claim holds the original chair owner *personally* and *individually* liable for his actions.  It does not define what it means for the owner or subsequent chair purchaser to own the chair in question.  The key distinction that follows is that the successor property owner is his predecessor's privy only when the prior legal judgment affected the property—*in rem* liability—rather than the individual—*in personam* liability.

[5] "With the burden; subject to an incumbrance or charge."  *Cum onere*, Black's Law Dictionary (2d ed. 1910).

be considered open. *Such decisions become rules of property*, and many titles may be injuriously affected by their change." (emphasis added)).

Defendants' argument simply puts the question: did the prior judgment in the Mayhew-Beard Suit involve an adjudication of Mayhew's *property* interests in the Mayhew Center Property (i.e., *in rem* liability) or Mayhew's *personal* rights (i.e., *in personam* liability)? As will appear, the answer is the prior judgment involved only Mayhew's personal rights, not any interests in the Mayhew property.

The Mayhew-Beard Suit involved Mayhew's rights and liabilities under CERCLA. To hold GP Vincent bound by Mayhew's stipulated dismissal of that suit, we must first determine what kind of liability CERCLA imposes: *in rem* liability that runs with the polluted land or instead *in personam* liability imposed on the owner or owners to clean up the pollution. If CERCLA creates *in rem* liability, Defendants have a colorable claim that Mayhew and GP Vincent are in privity and that GP Vincent is bound to the stipulated dismissal of the Mayhew-Beard Suit. But if instead CERCLA creates only *in personam* liability, Mayhew and GP Vincent are *not* in privity and GP Vincent is *not* precluded from pursuing its CERCLA claims.

## B.  CERCLA Creates *In Personam* Liability

CERCLA imposes *in personam* liability. Thus, there is a lack of privity between GP Vincent and Mayhew. And GP Vincent is not bound by the doctrine of *res judicata* to the stipulated dismissal of the Mayhew-Beard Suit resulting from the global settlement. GP Vincent's suit can proceed on its merits.

To show why this is the case, let us start with the statute in question.  CERCLA was enacted in 1980, "in response to the serious environmental and health risks posed by industrial pollution."  *Burlington N. & Santa Fe Ry. Co. v. U.S.*, 556 U.S. 599, 602 (2009).  It is structured "to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for the contamination."  *Id.* (internal quotation marks and citation omitted).  To satisfy this policy goal, "CERCLA imposes strict liability for environmental contamination upon" certain classes of individuals denominated potentially responsible parties ("PRPs").  *Id.* at 608.  These PRPs include all current owners and operators of the contaminated property and those who were owners and operators of the property at the time the contamination occurred.  CERCLA § 107(a)(1)–(2).[6]  "Once an entity is identified as a PRP, it may be compelled to clean up a contaminated area or [to] reimburse the Government [or the party remediating the property] for [all] past and future response costs."  *Burlington*, 556 U.S. at 609.

PRPs can recoup clean-up costs via "cost-recovery actions under § 107(a) [or] contribution actions under § 113(f)."  *Arconic, Inc. v. APC Inv. Co.*, 969 F.3d 945, 951 (9th Cir. 2020) (citations omitted).  Cost-recovery actions enable PRPs to recoup "incurred 'response'—*i.e.*, cleanup— costs," whereas contribution actions "force other[ PRPs] to shoulder their [apportioned] share of the burden."  *Id.*

Under both provisions, CERCLA imposes obligations on *individual* persons and entities.  CERCLA § 107(a) refers to

---

[6] CERCLA is found in Title 42 of the U.S. Code.  *See* 42 U.S.C. §§ 9601 *et seq.*  Title 42 is not positive law, so I will cite only to the relevant section(s) of CERCLA.

"the owner and operator" or "any person who . . . owned or operated" a facility when it delimits *who* may incur costs related to remediation. Similarly, CERCLA § 113(f) (emphasis added) authorizes "[a]ny *person*" to initiate a contribution action against "any other *person* who is liable or potentially liable" under § 107(a). This focus on the individual parties is not surprising. CERCLA contains "broad power t[hat] command[s] government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. U.S.*, 511 U.S. 809, 814 (1994). And given how CERCLA is structured "to facilitate the *remediation of hazardous waste sites*," it forces *parties* to take specific actions to remove hazardous materials from polluted locations. *Whittaker Corp. v. U.S.*, 825 F.3d 1002, 1006 (9th Cir. 2016) (emphasis added). The entire purpose of the cost-recovery and contribution actions is to "encourage *private parties to assume the financial responsibility of cleanup* by allowing them to seek recovery from others." *Arconic*, 969 F.3d at 951 (alteration omitted) (emphasis added) (quoting *Key Tronic*, 511 U.S. at 819 n.13).

There is nothing about CERCLA's liability-sharing provisions or its requirement that PRPs take remedial action to abate and to remediate contamination that affects a PRP's property interests in its polluted land.[7] The clear import of

---

[7] In CERCLA itself, Congress appears to have clearly understood the distinction between *in personam* and *in rem* liability. Under CERCLA § 107(l), the federal government is given a federal lien on any polluted property that is subject to CERCLA remediation. This ensures the government can recover "[a]ll costs and damages for which *a person* is liable to the United States." *Id.* (emphasis added); *see also id.* § 107(m) (creating a similar federal maritime lien for vessels subject to CERCLA remediation). Thus, the federal government may initiate an *in rem* action

these provisions is to impose personal obligations on PRPs. They must either take certain actions regarding the pollution or pay their fair share of the costs of remediation.  This is the definition of *in personam* liability.  The statute imposes obligations on individual parties and assigns costs to be shared among those *actors* that have engaged in malfeasance.  A failure to remediate may result in the imposition of penalties on a landowner.  And a judgment for failure to remediate may be satisfied by the sale of the land if a judgment lien is recorded, and then executed, on the property.  But CERCLA cost-recovery or contribution actions do not affect who owns what interest in the land. Thus, one owner subject to CERCLA's requirements does not transfer a proverbial CERCLA liability stick in the bundle of property interests he conveys to the next owner. Successive owners are not in privity for CERCLA liability purposes.

Defendants' contrary assumption that CERCLA's *in personam* liability is conveyed with the polluted land overlooks two key features of CERCLA's structure.

First, while it is true that under CERCLA §§ 107 and 113, owners of polluted land have remediation obligations as to that polluted land, these statutory obligations do not derive from the extent of the PRPs' *property* interests.  A party's landowning *status* is CERCLA's criterion for

---

to recover remediation costs should the PRP fail to pay.  *Id.* § 107(l)(4). Congress's express choice to authorize *in rem* actions *only* for the federal government's right to recover remediation costs from PRPs who have not yet paid the remediation costs strongly implies that it deliberately chose to impose *in rem* liability in only that very limited scenario. *Bartenwerfer v. Buckley*, 143 S. Ct. 665, 673 (2023).  And this bolsters the conclusion that CERCLA liability, by default, constitutes only *in personam* liability.

determining *who*—that is to say, which person(s) or entity(ies)—is (are) liable for the property's remediation costs. This means CERCLA says nothing about the extent of the owner's proprietary rights in the land itself nor the extent to which the other possible owners' proprietary rights in the land are affected by CERCLA-imposed responsibilities.

Nor is this unusual. In tort law, premises liability imposes obligations on a property owner *in personam* to take certain actions regarding his property to protect third parties from harm. *See generally Hoffmann v. Young*, 515 P.3d 635, 640–42 (Cal. 2022). Under premises liability, the tort law identifies *which* parties have a duty to take these actions based on their landowning status. But just because the tort law relies on property ownership to impose responsibility for taking due care does not mean such obligations are charged against the property itself or affect its ownership. It is the landowner who has a *personal* duty to act in accordance with the age-old maxim *sic utere tuo, ut alienum non laedas*—use your own property so as not to injure the rights of another. *Cf. Hayes v. Mich. Cent. R.R. Co.*, 111 U.S. 228, 234–35 (1884) ("[A]t common law, the question is always whether, under the circumstances of the particular case, the railroad *has been constructed or operated* with such reasonable precautions for the safety of others, not in fault, as is required by the maxim, *sic utere tuo, ut non alienum loedas*." (emphasis added)). Hence, a plaintiff who obtains a judgment against a negligent defendant landowner acquires no interest in the land upon which his injury occurred, unless and until he levies the judgment through a judicial sale of the property. Just the same with CERCLA. CERCLA relies on a party's ownership *status*, as an owner of a contaminated site, to ascertain who must bear, *in personam*, the costs of

remediation.    How that owner bears those costs of remediation—from his pocketbook or from suffering a judicial sale of his property—is up to the judgment debtor.

Second, under CERCLA, preceding and succeeding property owners are placed in adverse postures to one another.  Because any past or current owner of a polluted site who may have caused the contamination constitutes a PRP, CERCLA § 107(a)(1), (2), whenever it is uncertain when the contamination occurred,[8] every party who held title may be liable for an apportioned share of the remediation costs under CERCLA.[9]  *Burlington*, 556 U.S at 609, 613–15.  If CERCLA obligations were to inhere in the property itself, the conflicting interests of successive property owners would not occur.  A successor owner stands in the shoes of his predecessor-in-interest with respect to the property in question.[10]  *Headwaters Inc. v. U.S. Forrest Serv.*, 399 F.3d

---

[8] There is almost certainly going to be uncertainty over the timing of the contamination in every CERCLA case.  Pollution discharge is normally a long-tail harm that occurs without the owner's full awareness.  Kenneth S. Abraham, *The Rise and Fall of Commercial Liability Insurance*, 87 Va. L. Rev. 85, 94–96 (2001).

[9] In this case, the timing of the contamination is uncertain.  Although Mayhew had alleged in the Mayhew-Beard Suit that all discharge of PCE on the Mayhew Center Property ceased when Mayhew purchased it in 1992, this factual question was never litigated.  Thus, Mayhew is still a PRP who stands adverse to GP Vincent, given GP Vincent is entitled to seek recovery of its remediation costs from Mayhew under CERCLA § 107(a)(2).

[10] That CERCLA liability is not associated with an owner's property rights in his polluted site is most obvious in the adverse possession context.  If GP Vincent obtained the polluted land by adverse possession, it would take no property right from Mayhew; GP Vincent's title would be created by the operation of law.  *E.g.*, *Marriage v. Keener*, 31 Cal.

1047, 1052–53 (9th Cir. 2005) ("Privity [] ar[ises] from a [] number of legal relationships in which two parties have identical or transferred rights with respect to a particular legal interest."); *accord Grondal v. United States*, 21 F.4th 1140, 1163 (9th Cir. 2021) (holding in an ejectment action that a lessor of Indian lands was not in privity with its lessee because there was a misalignment of property interests). Given a preceding owner may demand payment from a succeeding owner, and vice versa, for each party's respective portions of the remediation costs, their interests are not aligned under CERCLA.   Hence, a PRP's remediation obligations are not conveyed to the subsequent owner via the property's title.**[11]**

---

Rptr. 2d 511, 514 (Cal. Ct. App. 1994) ("Fee simple title vests in the adverse possessor by operation of law." (quoting *Williams v. Rogier*, 611 N.E.2d 189, 196 (Ind. Ct. App. 1993))).  Yet, GP Vincent would still have an obligation to remediate the land under CERCLA § 107(a).  And GP Vincent could still sue the previous parties who held title to recoup its remediation costs under CERCLA §§ 107(a) and 113(f).  Regardless how GP Vincent took title, it faces the exact same CERCLA liability. The means that CERCLA's remediation obligations and the attendant rights to cost recovery and contribution are *statutorily* created interests that attach to property owners, regardless how the ownership interest is created—they do not transfer by the grant of a fee simple deed.

[11] One final, passing observation.  Given that successive owners have conflicting interests under CERCLA, a preceding owner could not represent a future owner's interests in settlement negotiations without the future owner's consent.  Moreover, Mayhew's signature on the settlement agreement implies Mayhew was not aware it represented any other party's interest—let alone the interests of a future owner of the Mayhew Center Property.  Unlike Norma Beard, Mayhew did not purport to represent another. *See supra* note 2.  This implies it is unlikely that even Mayhew intended to have its obligations run with the Mayhew Center Property. *See FTC v. Garvey*, 383 F.3d 891, 898 (9th Cir. 2004)

The bottom line: all roads lead to the conclusion that CERCLA liability is personal and is not conveyed by the transfer of title to a contaminated site. GP Vincent and Mayhew therefore are not privies for the purposes of this CERCLA suit as GP Vincent was not a party to the settlement agreement reduced to judgment in the prior, consolidated action. And this lack of privity means GP Vincent's action is not barred by *res judicata*.

## III.    IDENTITY OF CLAIMS

Because GP Vincent is not Mayhew's privy, *res judicata* does not bar GP Vincent's suit. And given the lack of privity, it is unnecessary for me to reach the other elements of *res judicata*. But, because my friends in the majority conclude there is a lack of an identity of claims, I will briefly address the issue, lest one think that I agree with them on this point.

As noted above, for *res judicata* to apply, a defendant must demonstrate there is an identity of claims between the current suit and the prior litigation. *Mpoyo*, 430 F.3d at 987. An identity of claims exists if the current lawsuit raises issues that were or could have been raised in a prior suit because the causes arise from the same transaction or occurrence. *Id.*; *Stewart v. U.S. Bancorp*, 297 F.3d 953, 956 (9th Cir. 2002). In other words, two suits litigate the same claim if they request relief for the same alleged legal *harm*. *Mpoyo*, 430 F.3d at 987–88 (finding an identity of claims because two lawsuits arose from defendant's "conduct while Mpoyo was an employee and specifically from the events

---

(holding that privity does not exist if a party "is sued for its own actions," "not [] as an indemnitor for the acts of another," and had not "act[ed] *in its capacity as indemnitor*" in the prior action).

leading to his termination"). This means two suits can have an identity of claims regardless whether the litigants requested the same relief in each case. *McClain v. Apodaca*, 793 F.2d 1031, 1034 (9th Cir. 1986) (holding that there was an identity of claims despite plaintiff's request for different contractual remedies in each suit because "[w]hat is at issue [] is the preclusiveness of the judgment in the previous action *as to the legal harm* for which McClain seeks redress in his second action." (emphasis added)).

There is an identity of claims between GP Vincent's current suit and the Mayhew-Beard Suit. GP Vincent's complaint requests apportionment of the costs of remediation of the PCE contamination on the Mayhew Center Property among the PRPs under CERCLA. This was the exact harm Mayhew raised in the Mayhew-Beard Suit: Mayhew claimed Norma Beard was "absolutely and strictly liable for *all necessary costs* of response to investigate and [to] litigate and [to] remediate the release of, or threat of release of, hazardous substances *at the Mayhew Center property*." (emphasis added). Because both suits demand the court adjudicate the PRPs' respective CERCLA liabilities for the same legal harm, they raise the same claims.[12]

---

[12] The majority resists this conclusion by fixating on language drawn from the terms of the agreement governing the escrow fund as well as the injunction order entered in the Walnut Creek Manor Action. But the majority wrongly focuses on how the parties *settled* the consolidated actions. Under the caselaw, there is an identity of claims if the claims in the current suit "*were raised* or could have been raised in a prior action." *Stewart*, 297 F.3d at 956 (emphasis added) (internal quotation marks and citation omitted). To assess whether the Mayhew-Beard Suit *raised* the same claims as the current action, we look to the beginning of the

For this simple reason, my colleagues' conclusion that there is no identity of claims is in error. The majority contends that its "narrow[] construction of the [Mayhew-Beard Suit] claims" is bolstered by the fact that the Mayhew-Beard Suit, purportedly a CERCLA § 113 contribution action, and GP Vincent's current suit, purportedly a CERCLA § 107 cost-recovery action, implicate distinct statutory vehicles. The majority theorizes that the different statutory mechanisms to recoup remediation costs, while not "dispositive," motivates a conclusion that the suits involve different claims. This argument unfortunately ignores the broader prayer for relief evidenced by the plain language of Mayhew's own complaint against Norma Beard. *See supra* note 12. And its premise is incorrect: §§ 107 and 113 are

---

action—Mayhew's complaint against Norma Beard—not the end—how those claims were settled. As quoted above, Mayhew sought to recover from Norma Beard for *all pollution* on the Mayhew Center Property, not just for the PCE pollution that had seeped from the Mayhew Center Property onto the Walnut Creek Manor property. Certainly, sections of the Mayhew Center Property cannot conduct pollution onto the Walnut Creek Manor property because of their distance or because of geological formations under the land. But Mayhew did not so limit its complaint: "Plaintiffs are informed and belief [sic] and thereon allege that the defendant[, Norma Beard,] owned the Mayhew Center property where hazardous substances, including PCE, have been discharged and[/]or released *and have been found to have migrated into the environment on and under the Mayhew Center property* and the property of Walnut Creek Manor." (emphasis added). A plain reading of Mayhew's complaint reveals that Mayhew's CERCLA cost-recovery claim against Norma Beard encompassed *all* pollution on the Mayhew Center Property, whether connected to the pollution remediation of the Walnut Creek Manor Action or not. Thus, the majority's reliance on specific provisions in the global settlement causes it to ignore the fact that Mayhew raised the same claims in its complaint in the Mayhew-Beard Suit that GP Vincent seeks to litigate in this current suit. Simply, the record belies the majority's erroneous identity of claims analysis.

simply different mechanisms for PRPs to recover their remediation costs from one another—not different claims.

As the Supreme Court itself recognized, "§§ 107(a) and 113(f) provide [PRPs] two [] distinct," *U.S. v. Atlantic Research Corp.*, 551 U.S. 128, 138 (2007) (internal quotation marks and citation omitted), yet "similar and somewhat overlapping remed[ies]," *Key Tronic*, 511 U.S. at 816. But whether one pays up front and seeks cost-recovery under § 107 (akin to the legal remedy for damages) or instead foresees what the costs will be and demands contribution under § 113 (akin to the equitable remedy for contribution among tortfeasors), the right to obtain payment from other PRPs under CERCLA depends on the claimant's proving the *relative culpability* of all involved for the contamination. Simply, reliance on either § 107 or § 113 as a remedy does not mean different *claims* are at stake. Thus, even though Mayhew purportedly used a different mechanism to recover its remediation costs than GP Vincent, the harm alleged is the same: the proper allocation of responsibility among the PRPs under CERLCA for the contamination on the Mayhew Center Property. GP Vincent's current suit and the Mayhew-Beard Suit raise identical claims.

As a result, I disagree with the majority's conclusion that GP Vincent's suit and the Mayhew-Beard Suit involve different claims. Were it necessary for me to reach issue, I would conclude that there is an identity of claims.

## IV.    CONCLUSION

Despite my disagreement with the majority's mistaken identity of claims analysis, I agree that reversal is required. CERCLA imposes no *in rem* obligations, which means Mayhew's individual CERCLA obligations were not

conveyed with the transfer of title to the land. Because Mayhew and GP Vincent are not in privity with one another, GP Vincent is not bound by *res judicata* to the prior litigation's judgment involving Mayhew. GP Vincent's right to prosecute this CERCLA action must be sustained. The district court erred when it held otherwise.

On that basis alone, I concur in the judgment.